IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 14, 2018 Session

IN RE AYDEN S. ET AL.

Appeal from the Juvenile Court for Macon County
No. 2016-JV-136    Ken Witcher, Judge

_____

No. M2017-01185-COA-R3-PT

_____

Parents appeal the termination of parental rights to their three children. The juvenile court found three statutory grounds for termination: substantial noncompliance with the requirements of the permanency plans, persistence of conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility of the children. The court also found that termination of the parents' parental rights was in the children's best interest. We conclude the evidence of the statutory grounds for termination was less than clear and convincing. Thus, we reverse the termination of the parents' parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and J. STEVEN STAFFORD, P.J., W.S., joined.

Adam W. Parrish, Lebanon, Tennessee, for the appellants, Leslie S. and Curtis S.

Herbert H. Slatery III, Attorney General and Reporter, and Alexander S. Rieger, Deputy Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

Leslie S. ("Mother") and Curtis S. ("Father") have three children: Katelyn S., born in January 2007, C.J., born in December 2009, and Ayden S., born in March 2013. The Tennessee Department of Children's Services ("DCS") first became involved with the family prior to the birth of Ayden. While staying the night with their maternal

grandmother, Katelyn and C.J. managed to leave the home and find their way to a neighbor's house.

The incident did not result in any charges against Mother or Father, but the investigator noted concerns with the parents. According to the investigator, "there was mention of domestic violence between both [Father] and [Mother]." The investigator also learned of possible drug use by Father.

DCS offered the parents counseling, which was refused. And the case was closed without any court action.

Sadly, the indications of drug use proved true. In late-2011, the Juvenile Court for Macon County, Tennessee, adjudicated Katelyn and C.J. dependent and neglected based on the parents' abuse of prescription medication. After approximately one year and the completion of a trial home visit, the court restored custody to Mother and Father.

In April 2013, DCS received another referral alleging drug exposure. Upon investigation, both parents' drug screens were positive for opiates. Hair follicle tests conducted less than two weeks later showed Mother negative for all substances. But Father was positive for methamphetamines, oxycodone, hydrocodone, and amphetamines.

As a result, DCS filed a petition to declare all three children dependent and neglected. Based on the petition, the juvenile court issued an order, restraining Father from "coming about the person, residence or school of the . . . children" and prohibiting any contact with the children, except by court-ordered supervised visitation. The order also directed Mother not to allow any contact between the children and Father and to report any contact or attempted contact to DCS.

On September 5, 2013, the court entered an order adjudicating the children to be dependent and neglected based on the parents' stipulation and continuing the restraining order against Father. But the court permitted Mother to retain custody. The order included findings about the parents' positive drug screens but noted that, at the time of the screen, Mother had a prescription for hydrocodone following the recent birth of Ayden.

At some point thereafter, Father was arrested for breaking Mother's arm. Mother would later testify that the incident occurred in November 2013.

On August 25, 2014, nearly a year after the court returned custody to Mother, DCS moved for temporary legal custody of the children. The motion alleged that, five months earlier, two of the children had engaged in "sexually inappropriate behavior." The motion linked the behavior to abuse that occurred while one of the two children was

2

in foster care. According to the motion, DCS advised Mother of a mandatory requirement that the children receive counseling "and [of] the need for the children to be supervised at all times while together or with any other children to prevent further occurrences." But again according to the motion, the children had missed several counseling sessions and were not being properly supervised.

DCS further alleged that Ayden had injured his foot as a result of not being properly supervised and that the children had not received appropriate medical care outside of visits to the Health Department or Emergency Room. DCS claimed that Mother "display[ed] great difficulty parenting her children."

The motion also related to Father, alleging that he had "made minimal progress towards returning to the home." It expressed concern that Father was again abusing prescription drugs. And the motion claimed that Father was violating the court's restraining order and, with Mother's acquiescence, was visiting the children in Mother's home.

On October 23, 2014, the juvenile court entered an order finding that the children "continue to be dependent and neglected" based on the facts alleged in DCS's motion. And the court changed its previous disposition of the children, placing them in the custody of DCS.

While the children were in foster care, the parents participated in the creation of three permanency plans, from November 2014 to May 2016. Each of the subsequent plans acknowledged the parents' progress but for the most part included substantially similar requirements as the first plan.

In October 2015, the court granted Mother a ninety-day trial home visit with the children, which was extended by agreement for an additional ninety days. But in April 2016, the court terminated the trial home visit based on DCS's observations that, among other things, Mother's parenting of the children's behavior was ineffective, C.J. failed kindergarten, Ayden "regressed" from being potty-trained, and the family "ha[d] not made changes in their conduct" despite receiving services. These observations apparently stemmed from a single visit to Mother's home.

On October 4, 2016, DCS filed a petition to terminate Mother's and Father's parental rights. DCS alleged the same three statutory grounds for each parent: substantial noncompliance with the permanency plans, persistence of conditions, and failure to manifest an ability and willingness to resume custody of the children.

After a one-day trial, the juvenile court entered an order terminating the parental rights of both Mother and Father. The court found clear and convincing evidence of all three of the alleged statutory grounds for termination. And the court found clear and

3

convincing evidence that termination of parental rights was in the best interest of the children.

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). Second, they must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596. This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id*.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct.

4

App. 2007). We "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016), *cert. denied sub. nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016).

## III.

On appeal, Father and Mother challenge the grounds found for termination of parental rights. Both parents also challenge the finding that termination of their parental rights was in the children's best interest.

### A.

1. Substantial Noncompliance with the Requirements of the Permanency Plans

We begin with the juvenile court's finding that Father and Mother failed to substantially comply with the responsibilities in the permanency plans. *See* Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the trial court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). Only if the permanency plan requirements are reasonable does the court determine if the parent's noncompliance was substantial. *Id.* at 548-49.

The juvenile court found that the requirements of the permanency plans were reasonable and related to remedying the conditions that necessitated foster care. Father and Mother do not dispute this factual finding, and we conclude that the evidence was clear and convincing that the requirements were reasonable and related to remedying the conditions that necessitated foster care.

Instead, both parents' arguments center on noncompliance. So we must consider if any noncompliance by the parents was substantial in light of the importance of the unsatisfied requirement to the overall plan. *In re Valentine*, 79 S.W.3d at 548-49. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Although our focus is not on whether the parents achieved the "plan's desired outcomes," *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009), still the "parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis." *In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014).

5

On appeal, DCS concedes that the ground of substantial noncompliance was not appropriate against Mother. After reviewing the record, we agree. The proof showed, and the court properly found, that Mother completed every requirement under the permanency plans.

With respect to Father, in its final order, the court found, in relevant part:

[Father] has not completed all of the treatment recommendations from his A&D assessments, he has not followed the recommendations from his release from inpatient treatment, he has not stopped using alcohol, he has not demonstrated sobriety for at least 3 months, [and] he has not continued to participate in support groups . . . .

[H]e's just dropped out of the counseling that he was supposed to go to, and the counselor testified to that.

The evidence preponderates against the court's findings. The record shows Father exerted considerable efforts toward the completion of his tasks under the permanency plan. *See In re Valentine*, 79 S.W.3d at 549 ("Improvement toward compliance should be considered in a parent's favor."). And the court specifically found that Father was "in substantial compliance" with the permanency plan at the annual permanency hearing. The only remaining requirement at that time was that Father "need[ed] to maintain all of [his] progress and successfully complete a trial home visit."

From our review, a plan created May 2015 acknowledged, in relevant part, that Father demonstrated sobriety, obtained a sponsor, attended AA/NA regularly, completed parenting education, completed anger management, was participating in individual counseling, participated in mental health medication management, and was given positive feedback on his progress by the individual counselor. And in May 2016, five months before the filing of the termination petition, the newest plan noted similar progress. It was conceded at trial that Father cooperated with counseling sessions and parenting classes. DCS offered no proof that Father abused either alcohol or drugs in the year leading up to trial.

The evidence at trial as to Father's noncompliance centered around two things: (1) that he failed to complete an inpatient rehabilitation program he voluntarily checked himself into in March 2016, and (2) that he never resumed services with a counselor after she discharged him as a patient in November 2016 pending his participation in some recovery services. Although these two unsatisfied requirements may be important to ensure that Father adequately addresses his substance abuse problems, we cannot conclude on this record that DCS proved by clear and convincing evidence that Father failed to substantially comply with the responsibilities in the permanency plans.

6

## 2. Persistence of Conditions

The juvenile court also found termination of both parents' parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). Thus the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

> This ground authorizes termination of parental rights when:
>
> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

Here, the children were removed from Father's custody because of his drug use, and, under the facts of this case, domestic violence was also a condition that in all reasonable probability would cause the children to be subjected to further abuse or neglect. As to Mother, the children were removed because of her inadequate parenting skills, such as failure to take the children to counseling, failure to seek medical care for

them, and an apparent inability to control their behavior.[1]  Based on Mother's history, abuse of prescription drugs was also a potentially problematic condition.

The court determined the conditions still persist because the "things that led to the children being removed from the home are still there" and that it did "not see any changes in these parents' behaviors."  We disagree.

Mother had not failed a drug test since 2013.  And no witness could remember the last time that Father failed a drug screen.  Father's drug screen the morning of trial was negative.  The only evidence offered concerning continuing drug use by Father was his failure to complete the voluntary rehabilitation treatment for an alcohol "relapse" that occurred one year before trial.  We conclude that the evidence was insufficient to establish that the parents' drug problems persisted.[2]

DCS presented evidence of domestic violence committed by Father.  Just short of three years before the filing of the petition to terminate parental rights, Father broke Mother's arm.  But the evidence of domestic violence beyond that incident was largely circumstantial.  A case worker testified as to one "report," apparently from the children, that Father allegedly smacked Mother and threw keys at her one year before the trial.  Father testified that he did not throw the keys, but instead "tossed the keys."  And he denied smacking Mother.  Mother described the circumstance as an accident; she testified that "[h]e didn't mean the way he thr[ew] them at me."

Mother also testified that she had asked Father to leave the home a week before the trial.  But Father was back by the trial date.  Mother would not provide the reasons she asked Father to leave, calling it "personal."  In response to the question of when the last incident of domestic violence occurred, Mother responded "It's been awhile.  A few years ago, I guess."  DCS asked no follow-up, and on this record, we cannot determine if Father had committed domestic violence since he received services for that issue.

---

[1] Much was made at trial of Mother's failure to supervise the children, specifically to keep her eyes on Katelyn at all times.  The requirement to watch Katelyn "24/7" was based on a single allegation from over five years ago that Katelyn touched other children in a sexual manner, which DCS believed was related to abuse Katelyn received while she was in foster care in 2012.  But the court did "not get[] hung up on those [supervision] issues" and did "not . . . hold that against the mother that much."  And because there was no evidence that Katelyn's sexual acting out reoccurred, was ongoing, or was an issue with which she was struggling at the time of trial, we likewise do not consider Mother's alleged failure to constantly watch or supervise Katelyn a condition that would prevent the children's safe return.  Indeed, one witness observed that, as late as 2016, Mother was on her feet during one entire visit supervising the children, and the witness was unaware of any other incidents of Katelyn being left unsupervised with another child.

[2] A counselor testified she "suspect[ed] . . . once" that Father smelled of alcohol but failed to specify the date of the incident.

Evidence of inadequate parenting skills was mixed. Despite a slow start, Mother eventually started taking the children to counseling. And the order terminating the trial home visit recognized that "Mother [was] taking the children to medical appointments." The children's behavior at home did not improve, but there were no disciplinary issues at school.

DCS emphasized that Ayden regressed in his potty training, and the children were failing in school under Mother's care. And despite the abundance of services Mother received to help with her parenting skills, a case worker observed "a few incidents" where "[t]he children were fighting some," "they were trying to fight with their mother," and "[t]hey were hitting, and kicking, and things of that nature." Although inadequate parenting skills may, under some circumstances, constitute a condition that would cause a child to be subjected to further abuse or neglect and thus prevent the child's safe return to the care of the parent, DCS's proof fell short in this regard. *Compare State Dep't of Children's Servs. v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *12-14 (Tenn. Ct. App. May 30, 2002) (holding the evidence was not clear and convincing that mother was unable to care for her son despite, among other things, mother was unable to comfort her son, had to be reminded to check his diaper, and became frustrated with and did not know how to react to a tantrum, and noting that mother "ha[d] never harmed her child and d[id] not pose any threat to him"), *with Dep't of Human Servs. v. Adams*, No. 03A01-9403-CV-00114, 1994 WL 579911, at *9 & n.9 (Tenn. Ct. App. Oct. 24, 1994) (holding that the parents were "incapable of responsible parenting" because the children lived in "a cold and drafty house," were allowed to play outside for long periods of time in extremely cold weather, and were not fed, bathed, nor medicated properly).

Based on this record, we conclude the evidence was less than clear and convincing that the conditions which led to the children's removal or other conditions that in all reasonable probability would cause the children to be subjected to further abuse or neglect still persisted.[3] Because termination of parental rights on the ground of persistence of conditions requires clear and convincing evidence of each of the statutory elements, we need not address the remaining elements.

---

[3] The juvenile court remarked on the parents' progress in its order. Noting that this was not a typical parental termination case, the court found as follows:

It is undisputed, that the father has a job, the parents have a home, they have transportation, that the mother has participated in all services that have been offered to her, she has maintained contact with [DCS] throughout this case, they completed their psychological assessments, they visit with the children on a regular basis, don't hardly ever miss any visits with the children, and reschedule if they do, the mother pays child support, although the testimony shows that the father's the one that works and makes the money to pay her child support and the father doesn't pay it himself, but he apparently gives the money for the mother's child support to be paid, the mother attends the doctor and dentist appointments for the children. There are more positives tha[n] you see in a lot of other cases.

3. Failure to Manifest an Ability and Willingness to Personally Assume Custody or Financial Responsibility of the Children

Finally, the court found termination of the parental rights appropriate under § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14).

As to the first prong, the statute requires the party seeking termination to prove a negative: that the parent failed to manifest an ability *and* willingness to personally assume legal and physical custody or financial responsibility of the child. Here, despite finding that the parents "ha[d not] failed to manifest a willingness to assume custody" and that the "parents want these children," the juvenile court concluded DCS proved by clear and convincing evidence this ground against both parents. The court based its conclusion on the finding that the parents "d[id not] have the ability" to personally assume custody of the children.

In general, "statutory phrases separated by the word 'and' are usually to be interpreted in the conjunctive." *Stewart v. State*, 33 S.W.3d 785, 792 (Tenn. 2000). In the context of a "negative proof" connected by the word "and," a party "must prove that . . . all" of the listed items were not met. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 120 (2012).

At oral argument, DCS urged that we interpret the word "and" in the disjunctive so that it only had to prove an inability *or* unwillingness of the parents to assume custody of the children. Our supreme court has "recognized that the word 'and' can also be construed in the disjunctive where such a construction is necessary to further the intent of the legislature." *Stewart v. State*, 33 S.W.3d at 792. But because "we generally presume that the General Assembly purposefully chooses the words used in statutory language," *id.*; *cf.* SCALIA & GARNER, *supra*, at 116 ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives."), and the presumption has not been rebutted, we decline to adopt DCS's interpretation here.

We conclude that Tennessee Code Annotated § 36-1-113(g)(14) could not serve as a basis for terminating Mother's and Father's parental rights. The proof at trial negated a required element of the statutory ground. The juvenile court found: "In this case, these

parents definitely want to assume legal and physical custody of the children and are willing to assume financial responsibility for the children."

## B.

As DCS failed to prove by clear and convincing evidence a statutory ground for termination of the parents' parental rights, we do not reach the issue of the children's best interest. *See In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (requiring that the party seeking to terminate parental rights prove by clear and convincing evidence both a ground for termination and that termination is in the child's best interest).

## III.

For the foregoing reasons, we reverse the judgment of the juvenile court terminating the parental rights of Mother and Father.

_____
W. NEAL MCBRAYER, JUDGE